FRAME *v*. STATE.

Opinion delivered January 7, 1905.

1. JUROR—IMPROPER INFLUENCES—CONCLUSIVENESS OF COURT'S FINDING.— While proof that a juror separated from his fellows and was exposed to improper influences casts upon the State the burden of proving that he was not so influenced, the finding of the trial court that this burden has been met by the State will not be disturbed if supported by evidence, though against the decided weight thereof. (Page 508.)

2. TRIAL — PRESUMPTION.—Where an indictment was presented by a special grand jury in March, and trial was had in the following April, the presumption, in the absence of a contrary showing, is

that the grand jury was summoned as the statute requires, and that the court made such formal orders of opening and adjourning from day to day, or to a future day, as might be necessary to preserve jurisdiction. (Page 512.)

Appeal from Chicot Circuit Court.

ZACHARIAH T. WOOD, Judge.

Affirmed.

STATEMENT BY THE COURT.

At the March term, 1904, of the Chicot Circuit Court, the grand jury returned against appellant an indictment, charging that he, in the county of Chicot, and State of Arkansas, on the 11th day of March, 1904, did willfully, feloniously, and of his malice aforethought, and with deliberation and premeditation, kill and murder John Palmer, by shooting him with a pistol, against the peace and dignity of the State of Arkansas. At the same term, he was tried before a jury, and convicted of murder in the second degree; and sentenced to seven years in the penitentiary.

Frame killed Palmer by shooting him twice with a pistol. The medical expert who examined the body of Palmer testified that one shot entered Palmer's breast slightly to the left, about five inches below the collar bone and ranged inward and slightly downward, the other shot entered the stomach, and ranged upward and out. The wound about the left nipple went straight. The cuticle and muscle under it coincided exactly. "If Palmer had had his arm raised as stated, the skin over the wound would not have fitted perfectly around the hole made by the shot; but when his arm dropped in a natural position, the skin would have extended over to the edge of the wound. If the wound was in the left breast, beyond the left nipple, I think the raising of the right arm would slightly affect the muscle and cuticle there.

The account of the shooting as given by Fletcher Hougue, a witness for the State, is as follows: "I run a barber shop near where John Palmer was killed. On the night of the killing, Palmer, sometime before he was killed, was in my shop. I was near the little shop just north of the negro restaurant when the shooting took place; was on my way back to the barber shop. When

the first shot was fired, which was the first I knew of the diffi-
culty, I heard Palmer cry out, "Oh, you have killed me!" Then
the second shot was fired, and I started on a run to where the
shooting took place. When I got there, Mr. Frame was standing
on the walk, south of Giles's store. I ran up to him, put my hand
on his shoulder, and asked him what was the matter. He said:
"That fellow tried to cut me with a knife, and I shot him." I
then turned back to the man who was shot, and found him to be
John M. Palmer. He was still alive. About that time several
others came up, and some one brought a lantern. Zem Stelle
and Bill Smith were there. We took the body up, and laid it on
the gallery. Either Zem Stelle or Bill Smith picked up a knife
from where Palmer was lying. I recognize this as the knife.
Some one marked it with these marks. I was the first man to
get to Frame after the shooting. No one there but Bill Frame.
Soon afterwards I saw Smith, and I afterwards saw Zem Stelle
and Abner Gaines. Abner Gaines was the marshal, and in a
short time there was a big crowd there. I could not remember
who all was there. I stayed there until after we put him on the
gallery, and probably went back into my barber shop; but I know
I was the first man there."

The defendant himself testified as follows: "I have known
John M. Palmer for some time. Some time before nine o'clock,
the night of the difficulty, I went over to my shop, and closed it.
Then I went around to Bailey's saloon, and took a drink. I then
went to Matthews's saloon, where I told Lem Jackson I thought I
was going to Louisiana. He said, "Let's split a bottle of beer,"
which we did. I then walked out, crossed over the street, passed
in front of Gaines's Hardware Co., going toward the saloon we
called "Louisiana." Just before I got to Giles's corner, I saw Mr.
Palmer coming across from Rosenzweig's corner. I met him
right at Giles's corner. He walked a little past me, then stopped
me, saying, "Hold on there; I want to see you." I took one more
step, and he called the second time. I turned around, and he
asked me if I wasn't going to pay that account. I said, "No."
He said, "It's a damned rascally trick in you, if you don't; you
stood good for the Brown account." I said: "You are a damned
liar!" Just at this time he drew his hand out of his pocket with his
knife open, and made at me, as if to cut me, and I drew my pistol
out, and shot him quick, and then shot him again, as quick as I

could fire. I fired these shots because he was coming on me with his knife drawn to cut me, and I did it in my own self-defense, believing he was going to kill me, as he said he would do. I did not fire until he drew his knife and started to me."

Another witness, John White, for appellant, testifies as to the immediate transaction as follows: "Just as I passed the barber shop, I heard some talk between two persons standing on the sidewalk in front of Giles's store, and about that time a shot was fired. My attention was first attracted by the brash talking, and I looked in that direction, and I saw one man with a knife in his hand raised in an attitude to strike, and I halted. A shot was fired, and I had moved on a foot or two further. If the shot had missed the man, it would have struck me. And then another shot was fired. It was the man that was shot who had the knife in his hand. The two parties were five or six feet apart. Mr. Frame was standing at the corner of Giles's store, about where the walk that runs from the store down to the depot joins the walk that runs north, in front of Giles's store. The man that was shot was Mr. Palmer, who was standing about in front of the door of Giles's store, near the edge of the sidewalk next to the ditch. I was walking in the middle of the street. There was a light on Mr. Rosenzweig's corner, and his store was open and lighted up. I could see plainly. I did not run when the shots were fired. After Mr. Palmer fell I walked along in the street around Giles's corner, and on the sidewalk back of where Mr. Frame was standing. A big crowd gathered pretty quick."

William Smith testified: "I am a railroad engineer on the Mississippi River, Hamburg & Western Railroad. I know the defendant, and knew the deceased. On the night of the killing I went into Hougue's barber shop to get a shave. Several parties were ahead of me, and I concluded to go back home. As I was in the act of stepping from the porch to the sidewalk, I heard a pistol shot, some twelve or fifteen feet away, at the corner of Giles's store. I heard an exclamation, 'O my God!' or something, and saw a man falling back. About that time the second shot was fired. I immediately walked up to Mr. Frame. He was standing on the sidewalk, and had the smoking pistol in his hand. I asked him what was the matter. He said 'That man tried to cut me, and I shot him.' He turned as if to walk off. I told him

to hold on, and he stayed until Abner Gaines came and arrested him. About this time Zem Stelle and some others came. One of them had a lantern. We looked for the knife, and Zem Stelle and I saw it about the same time, lying somewhere about the calf of Palmer's leg. Stelle picked it up, and put some marks on the handle to identify it. I also put some marks on it. This is the knife. I know it from the marks. I was the first man to Mr. Frame after the shooting. There was no one else there that I saw. The place along there was light, and I could see Mr. Frame. There was a light over in front of Rosenzweig's store, an acety-lene gas lamp that was shining across the street. You could see from Rosenzweig's clear across to where they were standing. The barber shop was lighted, and you could see out into the street, and I think there was a dim light in Giles's store. I helped lay Palmer's body upon the gallery. From the time the last shot was fired, I stood between the body of Palmer and Mr. Frame. The big blade of the knife was open when Mr. Stelle picked it up. I was from ten to twelve feet from Palmer when he was shot. I did not see him or Mr. Frame before the first shot was fired. I had my hand on the post, the third post from the end of the gal-lery, and was looking down, preparatory to stepping off the porch to the sidewalk, when the first shot was fired. I did not see the flash of the pistol. When Palmer cried out, I looked up, and did not see the flash the second shot. I went immediately to Mr. Frame, and put my hand on his shoulder. I heard nothing until the shot was fired. If there had been any loud talking between Frame and Palmer, I could have heard it. I had had no difficulty with Palmer previous to the killing."

Other witnesses testify for appellant as to the open knife being found where the deceased was lying, and identify the knife as the knife of deceased. The sheriff testified to finding a small pearl-handled knife in the pocket of deceased. And witnesses on behalf of the State, in rebuttal, identified the small knife taken from Palmer's pocket by the sheriff as Palmer's knife, and they could not identify the other as his knife. There was testimony tending to show that Palmer had two pocket knives, and also testimony tending to show the contrary. There was testimony on behalf of the State to impeach the character of appellant's witness, White, who claims to have seen the deceased with his

knife drawn to cut defendant, and also testimony tending to show that White was not there.

In rebuttal on behalf of the State, J. W. Tharpe testified: "John Palmer was conducting a butcher business at Lake Village. His lower meat shop was next to the shop of defendant, William Frame. On the evening Palmer was killed, I was in my shop, and saw defendant walking on the gallery in front of the shop. He passed the door several times and looked in. After I closed up my shop, I came out, and saw the defendant standing in front of the door of his shop. I went to Mr. Hougue's barber shop to get a shave, and met Mr. Palmer there. He left the shop for a while, and again came back. When he returned, I was in the front chair, and a barber was preparing to shave me. He said to me, 'I will not wait; you may come to my room when you get through.' He then walked out of the shop. The barber had just lathered my face when he left. As Palmer walked out, the barber picked up his razor, and made one rake on my face. Then I heard the first shot, and heard Palmer cry out, 'My God, don't shoot me any more; you have killed me.' Then the second shot was fired. I tried to get up, but the barber said, 'Stay still; don't go out there,' and I didn't go. It was about a half minute from the time Palmer left the shop door until the first shot was fired. (When the first shot fired, Morton ran in the front door of the shop, on to the back, and was there, inside, when the second shot fired. I have seen Palmer's pocket knife, and think I would recognize it. I never saw Palmer with such a knife as this one, with the marks on it; have seen Palmer's knife frequently."

And there was evidence tending to show great enmity existing on the part of Palmer against Frame, and that Palmer had made threats against Frame, some of which had been communicated to him.

*Robinson & Beadle, Harry E. Cook, B. F. Merritt, E. A. Bolton* and *Wm. Kirten,* for appellant.

There is no malice shown. *Cf.* Sand. & H. Dig. § § 1641, 1642, 1643. Hence there is no evidence to sustain a verdict of murder, and the conviction should be set aside. 34 Ark. 637, 640. The cause should be reversed for misconduct of the jury. 44 Ark. 115.

*Baldy Vinson* and *George W. Murphy, Attorney General,*
for appellee.

No such misconduct of the jury was shown as demanded
that the verdict be set aside.    12 Ark. 782; 20 Ark. 53; 26 Ark.
323; 26 Ark. 334; 28 Ark. 155; 29 Ark. 258; 40 Ark. 454; 66
Ark. 545.

WOOD, J., (after stating the facts.)    1.    Counsel in an able
argument contend that there was no testimony to show that
appellant was guilty of murder in the second degree, and for that
reason we have made a full statement of the evidence in the
record bearing upon the fatal rencounter.    The testimony of
appellant and his witness White, if believed by the jury, would
have entitled appellant to an acquittal on the ground of self-
defense.    But the testimony tending to show that White was not
present, and the testimony tending to show that he was not
worthy of belief, left the matter of the weight to be attached to
his testimony to the jury.    The testimony tending to show that
there was an open knife of deceased picked up where his body
was lying immediately after the shooting was strongly corrobora-
tive of the testimony of appellant and his witness White, that
Palmer was attempting to assault appellant with a knife at the
time the fatal shot was fired.    But, on the other hand, the tes-
timony of the physician who examined the dead body tended to
show that the wound described in the chest of deceased could not
have been made while deceased had his arm uplifted or in the
attitude of striking or cutting the appellant, and the testimony of
witnesses tending to show that Palmer had no such knife as that
described was contradictory of the theory of self-defense thus
put forth by appellant.    This conflict in the evidence certainly
makes it strictly the province of the jury to determine how and
why the fatal shots were fired.    The verdict indicates that the
jury did not believe the testimony of appellant and his witnesses
as to the manner and cause of the killing.    The killing was with
a deadly weapon; and if deceased was not attempting to cut appel-
lant with his knife, then the words that appellant testified that
the deceased used toward him, unaccompanied with any overt
act, were not sufficient even to have provoked the deadly assault
which appellant made on deceased.    The proof showed that ·

appellant and deceased were enemies; that appellant had been threatened by deceased, and had been informed of these threats. We think, under all the circumstances, it was a question for the jury, and not for this court, to determine as to whether or not the killing was done with malice aforethought. No complaint is made of any of the court's instructions. They were as complete on all phases of the case as appellant desired, and we are unwilling to disturb the verdict upon the evidence, since there was a conflict and evidence to support the finding.

2. In his third ground of the motion for new trial appellant complains of the misconduct of the jury, committed as follows: "That as the jurors were selected they were put in charge of an officer of the court, and admonished not to talk to one another, nor to anybody else, about the case, and were especially admonished not to drink any intoxicating liquors, and that the officer was instructed to keep them together and not permit them to talk to anybody about the case, nor any one to talk to them; that, in violation of the instructions so given, the jurors W. G. Bagwell, Luellen Sanders, H. Parnell, H. Greenberg and Burt Lea were placed in charge of Will Hackett; that they visited the enclosure back of Matthews's saloon, and were given both beer and whisky freely, and, while drinking, mingled with the bystanders and crowd, going to and coming from such place, and were subjected to improper influence thereby, and permitted to separate from one another while so drinking and mingling with the crowd; and that the balance of the jury were placed in charge of another deputy sheriff, W. R. Arnold, and said jurors and officer were similarly admonished; that he permitted them to separate and mingle with the populace, and the jurors in his charge were taken to the back room of Bailey's saloon, where they were permitted to mingle and drink with the crowd, and subjected to improper influence."

In support of this appellant adduced affidavits tending to show that the jurors procured liquor, one of them as much as a quart bottle at one time, and that on two occasions one of the jurors (Greenberg) bought a bottle of liquor; that on several occasions part of the jury visited the back part of a saloon, a wine room, where they were served frequently with drinks of both whisky and beer; that on several occasions, when the

jurors were in the back part of the saloon, the officer having them in charge, or one of the jurors, would go into the saloon and bring drinks and go back; that the case was frequently discussed at the bar, which was about eight feet from the wine room, and near enough for the discussion to be heard; that on one occasion two of the jurors were sixty or seventy feet away from the others, talking to another man. That juror Greenberg early in the morning went to the saloon on different occasions not in charge of an officer or the other jurors, and would buy his bottle of whisky; that the back part of the saloon was a urinal, and the jurors would go back there, and sit down on empty beer cases, and drink where parties were passing to and fro; that this went on during the trial.

Affidavits of all the jurors were adduced before the trial judge. They each deny the misconduct charged, and swear positively that they were at no time during the trial under the influence of liquor; that they did not discuss the case or hear it discussed by any one. They deny specifically the acts of misconduct charged in the affidavits adduced for appellant, and one of the special officers testified that, while on several occasions he took the jurors in his charge to the urinal in the rear of the saloon, and permitted them to take one drink, no one of them at any time was under the influence of liquor, and at no time did he permit the case to be discussed or permit them to be subjected to any improper influence.

While the misconduct of the jurors generally is complained of, that of the juror Greenberg is especially stressed. The testimony before the court as it relates to the conduct of this juror is as follows:

W. R. Arnold testified: "On the trial of this case the court appointed me one of the guards over the jury. Part of them were placed in my charge, and part in Wm. Hackett's charge. Mr. Greenberg was one of the jurors. He was in Mr. Hackett's charge. On Wednesday morning early, before the rest of the jurors had got up, I went down to Mr. Cornell's saloon, and when I went in Mr. Greenberg asked me to have a drink with him. This was after Greenberg had been accepted as a juror. No one was with him. He was separated from the other jurors. Once or twice we went back to the urinal, back of Cornell's

saloon, and would take a drink of whisky and some beer. I do not think any member of the jury was under the influence of liquor while on that case. I saw them constantly, and don't think they were intoxicated. They did not take enough whisky to intoxicate them. No one talked with any of the jurors in my presence."

L. C. Jackson testified: "I am bartender for Matthews. I know juror H. Greenberg. He told me he was a juror on this case. One morning, after he was taken on the jury, when I was coming to the saloon, I met him waiting for me. He wanted to buy some whisky. He bought a pint. The next morning he was at the same place, and bought a half pint. This about daylight He was by himself."

W. D. Bagnell testified: "I was one of the jurors in this case. I know H. Greenberg, who, with me and others, was in charge of William Hackett. I knew he left the other jurors twice. At one of these times we had to wait quite a while for him. I know of his getting up early. I saw him with a pint of whisky. He drank part of it. He was not drunk. Myself and Hackett went in back of the stable, back of Bailey's saloon, and when we went through, took a bottle of beer. I know of no one else taking a drink there. I sent and got a bottle of whisky. They all drank pretty freely, as long as mine lasted."

Greenberg himself testified as follows: "I was on the jury in this case. It is not true that the squad of six jurors visited the back of Matthews's saloon on several occasions, or on any occasion. I went to the urinal, back of the saloon, in charge of the officer, but did not go through the saloon. The five other jurors were then under the charge of Murray Strong, who had been appointed as deputy sheriff. The cause of my going at this time was bowel cramp and the necessity for using the closet. While there, T. K. Lee visited me, and in the presence of the officer gave me a dose of medicine, and suggested that a drink of whisky would help me. I then requested the officer to step into the saloon and get me a small bottle of whisky, which he did. I took one swallow of it, and have not seen the bottle since. The officer was neither out of sight or hearing of me, nor was I out of his sight or hearing. No conversation took place between me and any one else, except as I have stated. I bought no bottle of whisky from Matthews's saloon or any other saloon,

except as I have stated herein. I was at no time at Matthews's saloon in any morning, or at any other time, waiting for the barkeeper, L. C. Jackson, or any other barkeeper to come. I was at no time out of the charge of the officer, or out of his hearing or sight, from the time I became a juror until I was discharged. Until the case was finally submitted to the jury, it was not discussed by us or by any one in my presence or hearing. I was subjected to no improper influence."

Appellant's counsel, relying upon the authority of *Maclin* v. *State,* 44 Ark. 115, to the effect that the separation of a juror from his fellows pending the trial of criminal cases casts upon the State the burden of proving that no improper influence was brought to bear on him, contend that the State has not met this burden, and that this verdict should be set aside on account of the misconduct of this juror. In the Maclin case the separation and opportunity for the juror to be improperly influenced was shown, but the juror was not sworn on the part of the State to show that he was not improperly influenced. Here all the jurors whose conduct is called in question were called, and testify that they were at no time under the influence of liquor, and did not at any time discuss with others, or hear others discuss the case, and did not discuss it among themselves until it was finally submitted to them for decision. And the juror Greenberg, whose conduct is so severely arraigned, denies specifically the alleged acts of misconduct attributed to him, and shows that he was not under the influence of liquor, and that the case was not discussed in his presence or hearing until after final submission. It is true that this witness is contradicted in many particulars by several other witnesses. But the trial judge is better qualified to pass upon these contradictions than this court. He has the witnesses before him, and can better judge their credibility than this court. It is peculiarly his province to weigh the conflicting statements, and ascertain the truth. After he has done so, we will not disturb his finding where the evidence is conflicting, although we may regard his finding on the question as against the decided weight of the evidence. When trial courts are impressed with the necessity of keeping the jurors together during the trial of a felony case, in order that they may not be subjected to improper influences, they should see that the jurors, and especially the officers having them in charge, obey strictly

every order and direction of the court looking to the integrity of the trial; and where jurors or officers disobey the orders of the court, they should be swiftly punished for contempt, whether the purity of the trial is affected by such misconduct or not. For in no other way can the tribunal enforce respect for its own orders and preserve the jury from contamination. But the question for us at last, in any case where the court's orders have been disobeyed, and the verdict of the jury is thereby called in question on account of alleged misconduct, is not whether jurors and officers should be punished for contempt by the trial judge, but whether such alleged misconduct has resulted in an impure verdict. The law undoubtedly is that where such misconduct is shown, the presumption is against the integrity of the verdict, and the burden is upon the State to remove it by showing that no prejudicial influence was exerted over the jury. *Maclin* v. *State, supra.* The State met the burden in this case by proof which was satisfactory to the lower court, and sufficient here to sustain its ruling. *Payne* v. *State,* 66 Ark. 545, and authorities cited.

3. Appellant contends that, inasmuch as the record fails to show that a special grand jury was impaneled after the regular grand jury had been discharged, and inasmuch as the record fails to show that the regular March term in the Chicot Circuit Court was opened on the first Monday in March as prescribed by law, there is no showing of jurisdiction. There is nothing in this. The record shows that at the March term, 1904, of the Chicot Circuit Court, the indictment upon which appellant was tried was presented by a special grand jury. It shows also that on March 16 the case was set for trial on the second week of the present term. It shows that on the 12th day of April, 1904, there was an arraignment and plea of not guilty, and that on April 13, 1904, a jury was duly impaneled to try appellant. As the court is shown to have been in session at the regular March term, as prescribed by law, the presumption is that the special grand jury was called as the statute requires, and that the court made such formal orders of opening and adjourning from day to day, or to a future day, as might be necessary to preserve its jurisdiction.

Finding no error, the judgment is affirmed.