HOOKER v. STATE.

Opinion delivered April 15, 1905.

1. TRIAL—IMPROPER ARGUMENT.—A reversal will not be ordered on account of an improper argument if it appears that no undue advantage was secured by the argument which has worked a prejudice to the losing party not warranted by the law and facts of the case. (Page 69.)

2. EVIDENCE — CONFESSIONS.— Incriminatory statements of the accused, voluntarily made to the peace officers while he was in their custody, without undue compulsion on their part, are admissible against him. (Page 71.)

3. SEPARATION OF JURY—CONCLUSIVENESS OF COURT'S FINDING.—A finding of the trial court that the jurors, while separated, were not exposed to improper influence will not be disturbed · if supported by legally sufficient evidence. (Page 71.)

Appeal from Garland Circuit Court.

ALEXANDER M. DUFFIE, Judge.

Affirmed.

*A. J. Murphy*, for appellant.

The confessions of a prisoner out of court and in the custody of officers are a doubtful species of evidence, and should be received with great caution. 1 Greenleaf, Ev. § 214; 34 Ark. 649; Sackett, Inst. Jur. 642. The argument of counsel and cross-examination of appellant was prejudicial. 62 Ark. 126; 61 Ark. 130; 156 U. S. 361; 58 Ark. 473; 75 Ind. 220; 46 L. R. A. 641; 69 Ark. 657.

*Robert L. Rogers, Attorney General,* for appellee.

Section 2321 of Kirby's Digest is directory. 53 Ark. 67. The confession of appellant was properly admitted. 14 Ark. 562; 35 Ark. 35; 19 Ark. 156; 34 Ark. 653. The instructions of the court were proper. 25 Ark. 408; 35 Ark. 585; 36 Ark. 135; 34 Ark. 649; 20 Ark. 619.

HILL, C. J. Houston Hooker was the negro porter on one of the "Valley trains" under charge of Conductor Atwood, and had served under him in that capacity for a long time. On the 25th of last October, while passing through Saline County, Hooker entered the negro coach where Atwood was collecting fares, and shot him to death. His testimony is to the effect that, in pursuance of threats previously made, Atwood attacked him and struck him a heavy blow, and in the encounter he (Hooker) fired the fatal shots. His testimony is wholly without corroboration, and in the face of the testimony of the eyewitnesses and of statements made by Hooker immediately following the tragedy and confessions subsequently made to the officers.

The eyewitnesses were all negroes, and, with the exception of one of them, did not see the beginning of the encounter, as it occurred in the rear of the coach. The one who saw the beginning says that Hooker approached Atwood, and grabbed him by the coat, and fired without a word having passed, and that then they tussled. Another witness heard the shot, and, turning, saw Hooker holding Atwood in the position described by the first witness. Another witness on hearing the shot looked and saw Atwood grab Hooker and the tussle began. Others looked after the first shot, and saw them clinched and tussling, presumably over the pistol, and saw the subsequent shots. All agree that the shot was the first intimation of any trouble between them. Hooker immediately after leaving the coach began making statements, some to the effect that he had killed his best friend, others to the effect that Atwood had called him opprobious names, and had maltreated him, and he could not stand it longer. To a negro woman he said he was forced to do what he did as Atwood had been whipping him, "and he could not stand for it." Various statements of like tenor were made to others. The evidence showed Hooker locked the door in the white coach, and he afterwards stated that was to keep the white people from getting to him "until he finished the job." Immediately after the shooting he

began expressing fears of being lynched, and frequently referred to negroes being mobbed for killing white people. In one of these statements he told of spending some months up North, and of Atwood getting his leave of absence extended and writing him nice letters while he was in New York. In this connection he stated that negroes were not treated in the North like they were here, and told of his grievance against Atwood for slapping him. It is apparent from the entire statements of Hooker that Atwood was kind to him and a good friend to him, but that he punished him for his mistakes and neglectful ways by slapping him. Atwood was a much larger and more powerful man than Hooker.

In the cross-examination of Hooker the State attempted to prove that he had made statements to the effect that while up North he had white men working under him, and he would eat at the table with them. Hooker denied such statements, and said: "I hope the good people of Arkansas won't get that in their heads, that that trip would spoil a nigger of my age." The defendant's counsel objected to this line of cross-examination, and the State sought to sustain it upon the ground that it would furnish a motive for the crime. The court ruled it out upon the ground that, if the State relied upon such evidence as a motive, it should have offered it in the first instance, and not at that stage of the trial. Nothing further appears in the record as to the race question until the closing argument of the special counsel for the State, when this occurred: "W. H. Martin, Esquire, in his closing argument, stated that Mr. A. J. Murphy, one of the defendant's attorneys, had criticized everything and everybody connected with the trial; that he had even criticized the court for calling a special term to try the defendant; that he had been allowed great latitude by the court, and had gone to great length in making statements not in the record; that Mr. Murphy had claimed that the State had injected racial prejudice into the case, when such was not the fact. 'Why, gentlemen,' said Mr. Martin, 'the State has not injected racial prejudice in the case. We have not attempted to do so. Mr. Murphy has, at every stage of the proceedings, injected racial questions into the case. The State has not, and has no desire to inject racial questions into the case. The State wants the defendant to have a fair and impartial trial, the same trial as if it were a white man. We want you to

try him just as you would a white man for his life. The State has simply introduced the facts in the case; has shown that the defendant went North last summer and returned with a changed and perverted nature, and that the unfortunate and deplorable state of feeling which we all know has recently existed among some of the colored people shows a motive for the killing.'" Apt objection was made to this argument, and it was overruled, and proper exception saved.

Much liberty must be accorded to attorneys for the State in searching the evidence for a motive, but before a motive, inflammatory in its nature, should be ascribed to a defendant, it should be fairly deducible from the evidence. The utmost that can be said of this evidence is that Hooker's trip to the North probably gave him a different viewpoint of the treatment he had theretofore received at Atwood's hands. The real motive disclosed in the evidence was revenge for these alleged grievances, and at that the prosecutor should have stopped, and not searched for a reason for the motive. But every improper argument does not call for a reversal. After reviewing the decisions, the court recently said: "In the final analysis, the reversal rests upon an undue advantage having been secured by argument which has worked a prejudice to the losing party not warranted by the law and facts of the case." *Kansas City So. Ry. Co.* v. *Murphy,* 74 Ark. 256. No trace of prejudice can be detected in the verdict in this case. The evidence irresistibly convinces that it was a wanton attack in revenge for real or imaginary grievances previously suffered at the hands of Atwood.

The jury could not have arrived at any other verdict upon the facts unless they had arbitrarily discarded the evidence of the witnesses nearest the parties, men and women of Hooker's own race, and his numerous and oft-repeated statements, some almost a part of the *res gestae,* entirely contradictory of his evidence. Therefore the only matters left for the consideration of the court are the questions of law arising in the trial. The instructions were, when taken together, a fair presentation of the law; and presented every phase which the defendant was entitled to have considered by the jury. No new questions are raised, and a discussion of them is not necessary.

Objection is made to the testimony of different peace officers giving the statements of Hooker while in their custody or while in the penitentiary who talked with him there.

There is not the slightest evidence that any of these statements were made under duress, or that promises and hopes were held out to him to induce the confessions. In some instances the officers warned him against talking to any one except his lawyer. In fact, Hooker makes no claim of any improper influence or fear or hope being brought to bear to induce these confessions; he merely denies recollection of them. He was in great fear of a mob, and looked to the officers to protect him, and talked freely and fully to them of his case, volunteering statements and answering all questions their curiosity prompted. At peril of their own lives some of the officers did protect him from a mob, and there is no trace of any inducement to Hooker to make these statements or desire on their part to hear them. The court properly instructed the jury on the subject.

In the motion for new trial it is alleged that the jurors separated during the trial, and affidavits were introduced tending to show that such separation subjected them to the opportunity for improper influences. Affidavits of eleven of the jurors and of the sheriff were introduced to show that they were not subjected to any outside influences whatever, and the separations were incidental and trivial occurrences during which time no opportunity was offered for extraneous influences to be brought to bear upon them, and none were brought. In *Frame* v. *State*, 73 Ark. 501, this question was recently considered fully, and it was there ruled that where the circuit judge had before him legally sufficient evidence to show that the jury were not subjected to improper influences, his findings will not be disturbed on appeal, and it will be considered that the presumption against the integrity of the verdict founded on the opportunity of improper influences is overcome by such evidence.

The court is of opinion that the defendant has had a fair and impartial trial, and that the jury returned a verdict responsive to the evidence, and the judgment is affirmed.