BEASON v. STATE.

Opinion delivered November 10, 1924.

1. HOMICIDE—SUFFICIENCY OF EVIDENCE.—Evidence *held* sufficient to sustain a conviction for murder in the first degree.

2. HOMICIDE—INSTRUCTION AS TO PROVING MITIGATING CIRCUMSTANCES.—Where there was evidence to sustain a conviction of murder in the first degree, it was not error to give an instruction in the language of the statute that, where the killing is proved, the burden of proving mitigating circumstances that justify or excuse the homicide devolved on defendant.

3. HOMICIDE—ABSTRACT INSTRUCTION.—An instruction in a murder case that the defendant was not required to suspend his defense, even if deceased was apparently withdrawing, if defendant honestly believed that deceased was withdrawing for the purpose of seeking a better position to renew the combat, was properly refused where there was no testimony tending to prove such a state of facts.

4. CRIMINAL LAW—MISCONDUCT OF JUROR.—Where an affidavit named a particular juror as having communicated with outsiders, and the juror's counter-affidavit showed no impropriety

in such communication, a finding by the trial court that there was no misconduct is conclusive on the Supreme Court.

5. CRIMINAL LAW—BURDEN OF SHOWING MISCONDUCT OF JURY.— Where there has been no separation of the jury, the burden is on the defendant to show that the jurors were exposed to various influences.

6. CRIMINAL LAW—PRESUMPTION THAT OFFICER HAS DONE DUTY.— Where a jury is in charge of a sworn officer, it is presumed, until the contrary appears, that the officer did his duty and shielded the jury from improper influence.

7. CRIMINAL LAW—MISCONDUCT OF JUROR—EVIDENCE.—An affidavit as to a conversation of an unnamed juror and bystander was not sufficient alone to place the burden on the State to show that the juror was free from improper influence.

8. CRIMINAL LAW—CONTAMINATION OF JURY—BURDEN OF PROOF.— Where the jury in a criminal case is permitted to separate by order of the court, the mere opportunity for contamination of the jury is not sufficient to place any burden on the State, and the defendant must prove contaminating influence prejudicial to his case; but, where the jury is held together during the recess of the court, a showing by the defendant of an opportunity for exposure to noxious influences places the burden upon the State of showing that there was not prejudicial conduct or influences.

9. CRIMINAL LAW—EXPOSURE OF JURY.—Proof that the sworn deputy left an unsworn deputy in charge of the jury long enough to procure a watermelon for the jury, and that no juror left the room or conversed with outsiders during the deputy's absence, did not sustain a charge of misconduct.

Appeal from Lafayette Circuit Court; *James H. McCollum,* Judge; affirmed.

*Steve Carrigan, Searcy & Searcy,* and *McKay & Smith,* for appellant.

*J. S. Utley,* Attorney General, and *Darden Moose,* Assistant, for appellee.

McCULLOCH, C. J. Appellant was indicted for the crime of murder in the first degree, committed by shooting and killing Cody Franklin, and, on the trial of the cause, the jury returned a verdict of conviction of murder in the first degree, and fixed the punishment at life imprisonment.

The killing of Franklin by appellant was admitted, but he attempted to justify the killing on the grounds of

necessary self-defense. It is contended here that the evidence was not legally sufficient to sustain the conviction for any degree of homicide higher than manslaughter, and that the court erred in submitting the higher degrees to the jury.

Therefore, the first question presented for our consideration is whether or not the evidence is legally sufficient to sustain the verdict.

The killing occurred on the night of April 8, 1924, about midnight, at the store of Miss Ida Carlton, in the village of McKamie, where appellant was employed as a clerk. McKamie is a small village in Lafayette County, containing two stores and ten or twelve residences. Miss Carlton operated a mercantile establishment, and appellant was her clerk and salesman. Cody Franklin was a farmer in the neighborhood, and traded at Miss Carlton's store, and owed an account there at the time of the killing. Franklin came to the store that evening—drove up in a car with appellant and another person—and Franklin remained there at the store until he was killed. There were no eye-witnesses to the killing, but Miss Carlton was present, according to her testimony and that of appellant himself, at the time the controversy between the men first arose in the store. Several witnesses in the neighborhood heard the shots fired about midnight, and testified that there were three shots, which were fired in rapid succession. One of the witnesses introduced by the State testified that he heard the shots in the direction of the store, and, looking in that direction, he saw, shortly afterwards, a flashlight, and that, in about thirty or thirty-five minutes thereafter, appellant appeared at his house, and said that he had been cut with a knife. This witness and others went to the store, and found the dead body of Franklin lying out a short distance from the store—one witness said that it was forty or fifty yards from the store, and off to one side, near a ditch. There was one shot through the body, which entered from the back near the vertebra and emerged in front, near the man's breast. Witnesses who

examined Franklin's body testified that he had no knife, and that they found none near the body, and other witnesses testified that Franklin did not own a knife at that time. Franklin's wife testified that he had owned a knife before then, but that their baby had lost it, and that he owned none at the time of the killing.

According to the testimony of one of the witnesses, appellant made contradictory statements at the time with respect to the particular place where the difficulty began. Appellant testified that, after Franklin came to the store that night, he went back into the office with Miss Carlton, and that soon afterwards he heard a controversy between deceased and Miss Carlton about a payment of the account of the deceased. It seems from this testimony, as adduced by appellant, that deceased had offered to pay seventeen dollars on the account, and had exhibited a twenty-dollar bill, but that, after Miss Carlton had credited the amount on the account, he refused to hand over the bill. Miss Carlton testified to the same effect, as did another witness introduced by appellant, who was present at the time but who left shortly before the killing. After this controversy about the payment, appellant claimed that he retired to an adjoining room and left Miss Carlton and deceased in the store, and that he was aroused by hearing Miss Carlton fall to the floor, when deceased struck her or pushed her over. Miss Carlton testified that deceased did push her, and that she fell to the floor, and that appellant came out of the other room and walked up to the place in the store where she and deceased were at the time.

Appellant testified that, when he heard Miss Carlton scream, and opened the door and saw that he had either struck her or shoved her down, he ran and grabbed Miss Carlton, and the next thing he knew Franklin had jerked him out of the side door and was cutting him. He testified further that he and Franklin, after they got outside, scuffled around for fifteen or twenty feet, and that Franklin got him down on the ground, that he then thought of his gun, and, believing that Franklin was

going to kill him, he drew the gun, and when the gun went off he turned and ran. His exact statement was this: "I went to trying to get my gun, and so he seen me trying to get my gun, and in the scuffle there I don't know which one pulled the trigger, I guess I did. The gun went off, and he turned and run."

Now, the testimony of the other witnesses was, as before stated, to the effect that there were three shots fired, and there is no evidence that deceased had a pistol or a knife.

Appellant was contradicted by Miss Carlton, who testified that, after deceased shoved or struck her down and appellant came into the store-room, the deceased walked on out of the store, twenty or thirty feet ahead of appellant.

Appellant was also contradicted as to the place where the killing occurred, he stating that he was pulled out of the door fifteen or twenty feet away, whereas other testimony introduced by the State shows that the killing occurred forty or fifty yards from the store.

Considering all these circumstances and contradictions, and the fact that the deceased was shot in the back, the jury were warranted in rejecting appellant's explanation, and in reaching the conclusion that appellant followed deceased out of the store and shot him. Our conclusion therefore is that there was sufficient evidence to support the verdict, and that the court was justified in giving instructions submitting to the jury the issues as to the higher degrees of homicide.

This also disposes of appellant's contention that the court erred in giving instruction No. 9, which told the jury, in the language of the statute, that, where the killing is proved, "the burden of proving mitigating circumstances that justify or excuse the homicide shall devolve on the accused, unless, by proof on the part of the prosecution, it is sufficiently manifest that the offense only amounted to manslaughter or that the accused was justified or excused in committing the homicide." It is earnestly insisted that the proof adduced by the State

showed that the offense was not above the grade of manslaughter, and that therefore this instruction was erroneous, under the rule announced by this court in *Tanks* v. *State,* 71 Ark. 459; but, as before stated, our conclusion is that the evidence is sufficient to warrant a verdict for the higher offense, and that, from the proof adduced by the State, it is not "sufficiently manifest that the offense only amounted to manslaughter, or that the accused was justified or excused in committing the homicide."

There are other assignments of error with respect to the court's charge, one that the court erred in refusing to give instruction No. 13, which reads as follows:

"You are instructed that, if you believe from the evidence that when the defendant Beason came into the store, attracted by the noise of the disturbance, the deceased made a violent and felonious assault upon him, and caught hold of the defendant Beason and pulled him out of the door, and commenced to fight and cut the defendant, then the law would not require Beason to retreat, but he had the right, under the circumstances, to stand his ground and repel force with force, even to the extent of taking the life of the deceased, if the defendant honestly believed, acting on the facts and circumstances from his standpoint at the time, without fault or carelessness on his part, that it was necessary to save his own life or to prevent his receiving serious bodily injury at the hands of the deceased; and, if the jury find that the defendant Beason honestly believed, acting on the facts and circumstances as they appeared to him, from his standpoint, at the time, without fault or carelessness on his part, that the deceased was about to take his life or to do him great bodily harm, then the defendant Beason was not required to suspend his defense, even if the deceased, just before the shooting, was apparently withdrawing, if the defendant honestly believed, acting on the facts and circumstances as they appeared to him from his standpoint, at the time, without fault or carelessness on his part, that the deceased was withdrawing

apparently for the purpose of seeking a better position from which to continue and renew the combat."

All of this instruction, except that part which relates to the deceased apparently withdrawing just before the shooting, was fully covered by other instructions requested by appellant, and we are of the opinion that they fully and correctly submitted the issues to the jury. There was no testimony to the effect that deceased, after becoming the aggressor, if, in fact, he did become the aggressor, attempted to withdraw. At the time deceased walked out of the store there had been no difficulty between him and appellant. All of the testimony tending to show that the deceased was the aggressor was that of appellant himself, who testified that deceased grabbed him and dragged him out of the door, and, in the scuffle, cut him with a knife. Appellant makes no contention that deceased was armed except with a knife, and there was no occasion to submit the question of appellant's right and duty, if the deceased was withdrawing "apparently for the purpose of seeking a better position from which to continue and renew the combat." Counsel for appellant seek to invoke the principle announced by this court in the case of *Luckinbill* v. *State,* 52 Ark. 45, where the court held (quoting from the syllabus) that "where one is defending himself from an unlawful attempt to shoot him, it is not incumbent upon him to suspend his defense because his assailant is withdrawing himself from the immediate locality of the attempt, if such withdrawal is apparently for the purpose of securing a position from which to renew the combat with more efficiency." No such situation arose in the present case, and therefore the court was correct in not giving an instruction applicable to such a state of facts.

The other assignments of error relate to alleged misconduct of jurors and bystanders, constituting exposure of the members of the jury to improper influences. Appellant filed affidavits in support of these assignments, which were incorporated in the bill of exceptions. One of the affidavits tended to show that

the courtroom was crowded during the trial, and that the audience was permitted to crowd around the bench, about the jury-box and within the bar, and that the court permitted applause from the audience. The court makes a statement of the facts in the bill of exceptions, which refutes the charge of any failure on the part of the court to repress applause or any other misconduct in the presence of the court.

Another charge in the affidavit is that, while the jury was out deliberating, one of the members stood at a window and communicated by signs with one or more persons out in the courthouse yard. The affidavit named the particular juror who was said to have been the offender in this respect, and a counter-affidavit made by this juror was filed, which shows that he held no communication with outsiders at all, except to make a sign to a man eating an apple out in the yard, indicating that he (the juror) wanted an apple. It was within the province of the court to pass upon the question whether or not the charge of misconduct was sustained, and we feel bound by the finding of the court on that issue. *Payne* v. *State,* 66 Ark. 545; *Freels* v. *State,* 130 Ark. 189.

Still another charge in the same affidavits is that, during the recess of the court, while the jury was sitting in the box awaiting the coming of the trial judge, the court room was crowded with spectators, and persons were sitting on the edge of the platform on which the jury sat, and that those persons, as well as others in the court room, talked among themselves. The two affiants who made affidavits on this subject made the following statement: "I do not know what they were talking about, but I know that the people in that part of the courthouse where I was were talking about the case being tried. Considerable excitement prevailed, and considerable feeling was manifested against the defendant." Counsel for appellant insist that this statement in the affidavit made a *prima facie* case of misconduct and noxious influence upon the jury, and that the State has failed to overcome it. We have already stated the effect of our former deci-

sions to be that, where the jury separates after being ordered held together, a *prima facie* case is made which places the burden on the State to show that the jury was not exposed to improper influences. In addition to the cases we cited, counsel rely upon the comparatively recent case of *Holt* v. *State,* 131 Ark. 391. In that case, however, as well as in the other cases cited, there was an actual separation of the jury, and it was held that this placed the burden on the State. In the present case, however, there was no separation of the jury, and therefore the burden abided with the accused to show improper exposure to noxious influences, and the burden never shifted to the State at all. The affidavits in the present case do not show that there was any improper influence, for the affiants did not hear what was actually said in the presence of the jury, and did not know that anything improper was said. The jury was in charge of a sworn officer, and the presumption must be indulged, until the contrary is made to appear, that the officer did his duty and shielded the jury from improper influences. In addition to that, we think that if a *prima facie* case had been made by the affidavits it was overcome by the counter-affidavits of juror Ford, who stated that neither he nor the other jurors were subjected to improper influences. The finding of the court on that issue, if there was an issue raised by the affidavits, is binding upon us where there was a conflict in the testimony.

Another charge of misconduct and exposure of a juror to improper influences is based upon the following affidavit of Otis Park:

"I know Zack Beason, and I was present at his trial in the Lafayette Circuit Court. On the morning of the second day of the trial, when court was not in session and when the judge was not on the bench, I saw a bystander leaning over one of the jurors, who were in the box at the time, in the circuit court room, and I saw this bystander have his face down in about one foot of that of the juror, and the bystander had his hand up to his face and covering his mouth from the side next to the court room, and

juror's face was set in attention as though listening to the bystander· talk to him. I could hear, and, where I .sat, the bystander's hand shielded his mouth, and I could not see his lips move, but his position and attitude and that of the juror's appeared to me that the bystander was whispering into the ear of the juror, and the juror was intent upon what he was saying. This trial was at the August term, 1924, of the Lafayette Circuit Court. I am not related to Zack Beason, either by blood or marriage.''

There was no attempt on the part of the State to answer the charge covered by this affidavit, and the question presented is whether or not this affidavit is sufficient to make out a *prima facie* case so as to place upon the State the burden of showing that none of the jurors were exposed to improper influences. The rule, settled by repeated decisions of this court, is that, where the jury is permitted to separate by order of the court, the mere opportunity for contamination of the jury is not sufficient to place any burden on the State, but that the defendant must prove contaminating influences prejudicial to his case; but, where the court, by its order, holds the jury together, without separation, during the recesses of the court, a showing by the defendant of an opportunity for exposure to noxious influences places the burden upon the State of showing that there was no·such prejudicial conduct or influences. *Maclin* v. *State,* 44 Ark. 115; *Vowell* v. *State,* 72 Ark. 158; *Holt* v. *State,* 131 Ark. 391; *Brust* v. *State,* 153 Ark. 348. We are of the opinion that proof adduced on the part of the accused tending to show that a bystander secretly conversed with a juror or jurors, while the jury was being kept together under order of the court, even while in the courtroom in charge of an officer, awaiting the approach of the trial judge, is sufficient to cast upon the State the burden of showing that the juror in question was not subjected to any obnoxious influence, provided the testimony is sufficient to put the State on notice so that the burden cast upon it may be met. Now, it will be observed in the present instance that the affiant merely states that he

saw a bystander (without naming him) in secret conversation with a juror (without naming him). The affiant not only failed to name either the juror or the bystander, but also failed to furnish any other means of identification of either, or to state that he was unacquainted with either of the parties. If the affiant had named either the juror who was approached, or the bystander, the State would have been in position to call either one or the other to elicit all the facts with respect to the alleged conversation. Or, if the affiant had stated that he was not acquainted with either of the parties, and, for reasons given, could not state any means of identification, the State might even have gone to the extent of sending for all the members of the jury, but merely to state, in the affidavit, that an unnamed bystander approached one of the jurors in conversation is too vague and insufficient, we think, to cast upon the State the burden of showing that no such incident occurred, or, if it did occur, that the conversation was harmless.

Another charge of misconduct is that the court put under oath Deputy Sheriff Rowe, who took charge of the jury, but that, during the night, he left the jury in the jury-room for a short time, in charge of Lester, another deputy sheriff, who had not been sworn. The State filed a counter-affidavit by Lester to show that Rowe was only absent long enough to go on an errand to procure a watermelon for the jury, and that none of the jurors left the room during his absence or conversed with any one else about the case.

This answers all the assignments of error, and we are of the opinion that none of them is sustained.

It follows therefore that the judgment must be affirmed, and it is so ordered.