JOHN WEBER *v.* STATE OF ARKANSAS

5568                                                    466 S. W. 2d 253

Opinion delivered May 3, 1971

*Reed & Blackburn,* for appellant.

*Ray Thornton,* Attorney General; *Milton Lueken,* Asst. Atty. Gen., for appellee.

LYLE BROWN, Justice. John Weber appeals from a second degree murder conviction arising out of the death of Claude Brock on the night of December 15, 1969, in the community of Concord, Cleburne County. Appellant advances three points for reversal:

I. The court erred in allowing the introduction of ballistics testimony in that (a) appellant's counsel was not permitted to cross-examine one of the State's witnesses on that point; and (b) a proper foundation was not laid for the introduction of a shell casing;

II. Admissions purportedly made by the accused should have been suppressed; and

III. The court erred in ruling that Eva Jane Carter, a/k/a Eva Jane Weber, was not the wife of appellant and in permitting her to testify against appellant.

On the morning of December 16 Claude Brock was found dead in his front yard. He had been shot in the back by a high powered rifle. It was the State's theory that appellant and Eva Jane drove to the Brock home on the previous night; that Brock was driving away from his home but stopped on the approach of the Weber vehicle; that the two men got out of their cars and engaged in conversation; and that appellant shot Brock with a rifle which appellant had, about a month before, obtained

from Roscoe Brackett. The State's case rested mainly on two items of proof. First, it showed by the testimony of Eva Jane that she and appellant drove to the Brock home on the night of December 15; that the two men conversed while standing outside their cars; that she heard a gun fire but could not say who fired it; and that appellant returned to the car exclaiming, "My God, Jane, I have got to get you out of here." The witness said she knew appellant had a 30-30 rifle which was obtained from Roscoe Brackett and it was in the back seat of the car when the couple left Memphis the morning before the shooting that night. Second, Sgt. Honeycutt of the State Police, criminal investigation division, testified that he recovered a 30-30 bullet hull at the spot from whence the shot was said to have been fired. He obtained another bullet hull from Brackett, which was claimed to have been fired by the same rifle in November while Brackett owned the gun. Captain Paul McDonald, arms expert in charge of the State police laboratory, testified that "without a doubt" the two bullets were fired by the same rifle.

The foregoing recitation of testimony is sufficient to an understanding of appellant's first point for reversal. Appellant says his counsel was not permitted to cross-examine Sgt. Honeycutt. The sergeant was called to identify the shell hulls which the State sought to introduce. After direct examination was completed the witness was instructed to stand aside. Appellant's counsel suggested that he should be permitted to cross-examine Honeycutt. The court replied that such opportunity would be afforded. After witnesses Brackett and McDonald completed their tracing of the shells, Sgt. Honeycutt was called back to the stand and he was cross-examined extensively by appellant's counsel. While the better practice would have been to permit the cross-examination immediately on completion of the direct examination, we see no prejudice in the adopted procedure.

The other assertion of error in Point I is that a proper foundation was not laid for the introduction of the shell hull obtained from Brackett. If there was a motion to strike the testimony of either Brackett or Officer Honeycutt, it is not abstracted. Furthermore, we have examined

the detailed testimony of both witnesses on the point in question and it is clear that the evidence was sufficient to present a fact question.

The second point challenges the admissibility of statements purportedly made by the accused to the officers. On May 5, 1970, Sgt. Honeycutt interviewed appellant in the jail about mid-morning. The officer conceded that appellant appeared disheveled and sleepy, as if he had been up all night. The officer detected no odor of alcohol and said appellant responded coherently. The sergeant recited the preliminary statements he made to appellant which consisted of all the Miranda warnings, and said appellant indicated a willingness to answer questions. The officer said he asked these questions: "What did you do with the 30-30 rifle that you used to shoot Claude Brock with?" "What did you do with the automobile you were driving at the time the shooting occurred?" To those questions the appellant is said to have replied that he sold them somewhere in Mississippi. Appellant was asked about the 30-30 rifle he bought at Concord and he replied that he did not buy it, that he traded a drilling machine for it. (The latter statement corroborated a similar statement by Brackett.) The officer said he then asked appellant if he wanted to go into detail about the incident "and he stated he better consult a lawyer and the interview discontinued at this point." A deputy sheriff testified that he was present when Sgt. Honeycutt interviewed appellant and fairly corroborated the sergeant's testimony.

The accused testified at the Denno hearing. He categorically denied that he was given the Miranda warnings. He agreed that Honeycutt asked him the questions about the gun and the automobile, but he denied giving the answers Honeycutt recited. He said he told them he had been in Florida and he agreed with the officer that "running isn't much fun." He also admitted telling the officers he traded off the gun he got from "Slick" Brackett. Appellant said he was not drunk at the time of questioning and clearly recalled the interrogation. His main difference with the questioning officers was that he denied having been asked if he used the car and gun in connection with the killing of Claude Brock.

We have carefully reviewed the record on the question of voluntariness of the statements and considering the respectful consideration we give to the trial judge's findings on the issue, we are unable to say the court erred in holding the statements to have been made and voluntarily given. *Harris* v. *State,* 244 Ark. 314, 425 S. W. 2d 293 (1968).

This brings us to appellant's final point. The State gave notice in pretrial that it intended to call Eva Jane Carter, a/k/a Eva Jane Weber, as a witness against appellant. Appellant filed a motion to exclude her testimony on the ground that Eva Jane was his wife. At the conclusion of an evidentiary hearing the trial court ruled that Eva Jane and appellant were not husband and wife and therefore held the State could call her as a witness.

Eva Jane was the principal witness at the hearing on the motion to exclude her evidence. She relied (1) on a common law marriage in Texas and (2) on a marriage ceremony performed in Mexico. Here is a summary of her testimony on those two points:

John and I started dating in February 1958 and started living together as husband and wife in Seattle, Washington, in May 1958. We lived there six months and then went to Lubbock, Texas, where we lived and worked some four months. John worked as a mechanic and I was a waitress. From Lubbock we went to Colorado Springs and worked during the tourist season. From there we lived at various intervals in Idaho, Seattle, Indiana, following seasonal work, including the harvests. Then in 1963 we moved back to Lubbock and lived there three months. Then we returned to the west coast. During all those times we continuously considered ourselves husband and wife, cohabited as such, and held ourselves out as man and wife. Our baby was born in 1960. Here is my social security card in the name of Eva Jane Weber. Here is one of my withholding statements in the name of Jane Hunter Weber. We sent and received many letters in our travels and they all have

our names on them as Mr. and Mrs. Weber. Here are some of them.

Then in 1964 we decided we should go through a marriage ceremony, especially since we had a baby. We went across the border to Texacali, Mexico. We inquired about where a couple could get married and we were directed to a lawyer's office. He performed the marriage ceremony, charging us fifteen dollars. Here is our receipt. The receipt is styled MARRIAGE * * * * * RECORDING * * * * * RECEIPT. It gives the lawyer power of attorney to record our marriage, receipts us for our money and certifies that he would send us our official marriage certificate after recording. We never received the certificate; I had a letter sent to him but it came back showing the lawyer deceased.

We have continued to live together. There have been times when we had quarrels and separated but would go back together. In fact I started divorce proceeding once but we made up and the matter was dropped.

Texas recognizes common law marriages and the requirements may be classified as minimal. "To establish a common law marriage there must be an agreement express or implied between the parties to become husband and wife, cohabitation in pursuance of such agreement, and a holding out by the parties that they are husband and wife." *Moore* v. *Jordan*, 328 S. W. 2d 343 (1959). See *Darling* v. *Dent*, 82 Ark. 76, 100 S. W. 747 (1907). In *Darling* this court had occasion to treat with favor the validity of a Texas common law marriage. Eva Jane gave uncontradicted testimony which showed clearly that the parties met the three requirements of Texas law. In support thereof she produced her social security card, withholding statement, and numerous letters, all in the name of Mrs. Weber. Then there was the birth of the child, of which appellant was indisputably the father.

With respect to the purported marriage in Mexico, Eva Jane gave positive testimony that a marriage was

there performed and presented a document which strongly corroborated her recitation of facts.

Appellant, having moved to exclude Eva Jane's testimony on the ground that she was his wife, initially carried the burden of sustaining the point. *McFarland* v. *State,* 165 Ark. 431, 264 S. W. 938 (1924). But once substantial evidence of a marriage is introduced the marriage is presumed to be valid "and the burden of proof is on the party attacking it." *Yocum* v. *Holmes,* 222 Ark. 251, 258 S. W. 2d 535 (1953). In *Yocum* the only evidence of the marriage was the bare statement of the wife that "she married Holmes in April 1950 in Camden, Arkansas." That testimony was held sufficient to make a factual question as to whether the marriage took place.

A Mexican marriage was involved in *Miller* v. *State,* 235 Ark. 880, 362 S. W. 2d 443 (1962). There the court said: "No presumption of law is much stronger than the presumption that a marriage is lawful, innocent and not criminal." It was further said that the presumption is so strong and so positive as to require one who asserts illegality to assume the burden of proving that illegality.

The abundance of evidence presented by the testimony of Eva Jane, and her supporting exhibits, were certainly sufficient to raise the presumption of marriage, both at common law in Texas and a ceremonial marriage in Mexico. Faced with that evidence it became incumbent on the State to refute it and not a syllable of testimony was offered to repudiate Eva Jane's evidence. The trial court should have granted the motion to exclude.

Reversed and remanded.

HARRIS, C. J., and FOGLEMAN, J., concur.

JOHN A. FOGLEMAN, Justice, concurring. I concur in the result and all of the opinion except that part relating to the common law marriage. As I view the testimony, it clearly establishes the fact that the relationship between the witness and appellant was meretricious in its inception. This being so, it was necessary that there be af-

firmative proof of an abandonment of this relationship and the commencement of a new relationship. Even though the testimony of the witness was uncontradicted, it remained for the circuit judge to reach conclusions from inferences to be drawn from the testimony. The drawing of inferences is a part of the fact-finding process. I do not think it was unreasonable to have drawn an inference that the relationship continued as meretricious, at least until the attempted Mexican marriage. The circuit judge found discrepancies in the testimony of the witness at different times, and stated that he did not believe the later testimony of the witness about the parties' living in Texas.

In determining the admissibility of this testimony, the circuit judge was the trier of the facts. If there is substantial evidence to support his finding when he is by law trier of the facts, we affirm. *Mullins* v. *State,* 240 Ark. 608, 401 S. W. 2d 9; *Vaughan* v. *State,* 169 Ark. 1212, 277 S. W. 866; *Matthews* v. *Clay County,* 125 Ark. 136, 188 S. W. 564; *Cady* v. *Pack,* 135 Ark. 445, 205 S. W. 819; *French* v. *State,* 187 Ark. 782, 62 S. W. 2d 976; *Hooper* v. *State,* 186 Ark. 1197, 57 S. W. 2d 810; *Decker* v. *State,* 85 Ark. 64, 107 S. W. 182; *Beason* v. *State,* 166 Ark. 142, 265 S. W. 956.

I am authorized to state that Chief Justice Harris joins in this opinion.