MULLEN *v.* STATE.

Crim. 4020.

Opinion delivered February 15, 1937.

*Roy Mullen, W. P. Smith* and *O. C. Blackford,* for appellant.

*Jack Holt,* Attorney General, and *John P. Streepey,* Assistant, for appellee.

MEHAFFY, J. The appellant was convicted of receiving stolen property, and his punishment fixed at one year in the state penitentiary. The appellant filed petition for a change of venue, and a supporting affidavit signed by nine qualified electors. The persons who signed the affidavit were questioned in court, and after hearing the evidence of the witnesses, the court overruled the petition for a change of venue. The case was then tried and resulted in a verdict of guilty, and a judgment as above mentioned. This appeal is prosecuted to reverse the judgment of the circuit court.

Guy Morgan, one of the supporting witnesses for change of venue, testified that he lived at Hopewell, Lawrence township; that he had been in Ashland township; had heard lots of talk about the case and believed that the prejudice in his neighborhood was so strong he could not get a jury that would give him a fair trial. This witness, who lived in Lawrence township, said he thought he had been in Ashland township, but he did not know the name of any person he had heard talk; he was asked if he had been in several townships, naming them, and he said he had not, and could not say that persons in the other townships were prejudiced; he also testified that there was no more talk about this case than about any other ordinary crime of stealing; and he said he would not say that there were not men in his township who could be obtained that would give him a fair trial, and said he would not swear that there could not be a jury empanelled there that would give him a fair trial. He knew nothing about the other sections of the county, except the township where he lived.

Fred Buerklin, one of the supporting witnesses, testified that he did not believe Mullen could get a fair trial. This witness lived in Duty township. When asked to name witnesses he had heard talk, he named Gus Land, and said it had been about three months since he and Gus Land were at Mullen's. He also mentioned as persons he had heard talk about the case, Artie Garner and Tom Penn, but he did not hear either of these witnesses say he could not get a fair trial; just talked about this case and murder cases in the county, but he thought there was

more prejudice about this case than about a murder case. This witness, when asked how he came to be a witness, said he just supposed they needed somebody from that township and he was a good friend of John's; had been friends a number of years. Most of the talk this witness had heard had been around Portia, in his own township.

C. L. Bottoms, another witness who signed the affidavit, testified that he lived in Campbell township; he had not seen anybody in any of the other townships, and did not know whether anybody in the other townships were prejudiced or not. He stated he knew that in as much as the appellant had been on trial there, it would be hard to get a jury to give him a fair trial. He also stated: "Where a fellow has been tried four or five times and charged with four or five offenses, it is natural to get the people talking about him." This witness had heard some people say that Mullen ought to be sent to the penitentiary; that there were about ten indictments against him there from people losing chickens and other property.

M. J. Kelly, another supporting witness, testified that he lived at Hoxie in Boaz township, and had been in two townships in the eastern district, just passing through them, and that he formed his opinion from the newspaper publicity, and the general opinion is what he formed his opinion from. This witness testified that he did not think it would be necessary for him to name any individual. When asked if he thought appellant could not get a fair trial he said: "I'll tell you. There are so many chickens that are stolen that it is a general opinion of the people and it would be a hard matter for him to get justice. Well, he has many indictments found against him and with as many indictments found against one man as is found against John Mullen it is a hard matter to get an impartial trial." This witness said that some of the people he heard talk were related to appellant by marriage, and witness was kin to some that were in with appellant.

The other witnesses testified to substantially the same facts that were testified to by the witnesses mentioned.

Appellant states that to take the court's view, he still contends that at least two witnesses, Dr. J. C. Land and Homer Mays, testified that they had been in numbers of townships and heard the case discussed, and that leaving out the other witnesses, these two were sufficient to show the minds of the inhabitants and electors were such that appellant could not obtain a fair trial.

Dr. J. C. Land testified that he had been all over the eastern district two or three weeks after the occurrence; that he had no interest in the matter whatever and did not pay attention to whom it was, and could not name any person he had heard talk. He also testified that he had testified for John Mullen in every case he had had in that court; that is, when asked that question, he said he might have, he did not know.

Homer Mays testified that he lives in Walnut Ridge, but had been in a number of townships, and he said he worked a crew of men, about 175 or 200, at different times and would stop at Mr. Roberts' store, or Allisons', and on the street is all the talk he heard about it; that the sentiment was so strong against him he could not help but notice it; that the feeling was high against appellant, and all that he heard was that he was guilty and ought to be sent on.

When the petition for change of venue was overruled, the state introduced witnesses, and James Perry, a witness 18 years of age who had entered a plea of guilty to stealing the property of the Cart-Ritter Corporation, tells where he got the property, and says he took it to John Mullen's; Mullen was there when he arrived with it and unloaded it. He said they stole two jacks, one sledge hammer, one chopping axe. They took the property over to Mullen's on a mud boat and with Mullen's team, and witness told Mullen where he got it; told him he stole it and Mullen did not say anything about it; was working for Mullen at the time.

E. A. Cart, witness for appellee, testified that he is engaged in the pump and well business; is president of the Cart-Ritter Corporation; the company lost some tools in February; found part of them at John Mullen's place

and testified as to the value which was more than $10; witness had never seen Mullen before; lost a number of things, naming them, and found the jacks at Mullen's and recovered them, and some tackle; was present when conversation was held at Mullen's house; Mullen was also present; two small jacks were not property of the Cart-Ritter Corporation; Mullen said somebody else brought it there. He told the sheriff when the sheriff asked him if he knew that it was stolen property. "I thought it was stolen property." He said not to bring it there, it was stolen. Witness said they got only three jacks that had been stolen; he could not identify the steel cable; Mullen did not claim it, said some one else brought it there; Mullen said he thought the property was stolen; he never claimed ownership except the cable at Minturn; said that was his.

Thurman Holder, witness for state, a deputy sheriff, was down at Mullen's with officers the first day; looking after stolen chickens, saw tools that belonged to Ritter Company.

Bert Frazier, a State ranger, testified that he was at Mullen's with other officers and found the property there.

John Mullen, witness for himself, testified that the jacks were not his and did not know they were on the place; did not see them until the sheriff had his hands on them; was sick when they brought them there; they did not tell him anything about it; he had been moving boilers and engines and dredge boats and had pulleys and cables of his own; also moved a sawmill; did not know the jacks were on the place. Witness testified that the wire cable and pulleys belonged to him. Q. D. Hunter and James Perry confessed to stealing the property, and said they brought it in and put it in his shop and told him about it. Witness says they did not tell him a word about it; he never saw the jacks until the sheriff came; did not claim them; denies telling deputy sheriff Holder or any other person that he told the boys that they ought not to have gotten the stuff and brought it there; did not know it was there until officers got it; Jim Perry did

not come in the house and tell him they had stolen the stuff and brought it to the car house or tool shed like he told the jury. Witness testified that he has a serious cancer in his breast; had been sick; had not fed a horse or cow in two years; had not even climbed a ladder to get down hay; did not know this stolen stuff was on his property.

Rudy Jones testified that Hunter, about four months ago, tried to sell him a pair of jacks; did not see them; it was after the property was stolen that he tried to sell witness the jacks.

Dick Raines testified that Mr. Cart came to look at the steel cable he had borrowed from Mullen, he did not identify it; said it looked like his, but if it was it had been overhauled; this witness knew nothing about the jacks; never saw them.

Albert Johnson, witness for defendant, knows nothing about the jacks, but knows the steel cable that Mr. Raines borrowed from Mullen.

James Weaver testified that he was using the steel cable; some fellows came to look at it but did not claim the cable. Mr. Cart said he had lost some cable same size, but did not claim that one.

Thurman Holder testified in rebuttal that at the time they were at Mullen's, Mullen said he told these boys they ought not to have brought that stuff. There were several pulleys and jacks and cables that Mr. Cart did not claim; picked out his stuff and there identified it.

Bert Frazier testified in rebuttal that he was with Holder at Mullen's; Mullen made a statement that he had told these boys that they ought not to have brought that stuff there.

The appellant argues two assignments of error; first, that the court erred in overruling the petition for a change of venue; and, second, that the evidence was not sufficient to convict the defendant upon the uncorroborated testimony of Jim Perry, an accomplice; that the testimony of the accomplice was not sufficient corroboration to convict, and that the verdict of the jury was contrary to the instructions of the court.

Section 3087 of Crawford & Moses' Digest provides for a change of venue in criminal cases, and § 3088 tells how the application may be made. It reads as follows: "Such order of removal shall be made on the application of the defendant by petition setting forth the facts verified by affidavit, if reasonable notice of the application be given to the attorney for the state, and the truth of the allegations in such petition be supported by the affidavits of two credible persons who are qualified electors, actual residents of the county and not related to the defendant in any way."

A proper petition was filed for change of venue. An affidavit was prepared, corroborating appellant's petition, and was signed by 9 qualified electors, who were actual residents of the county. To test the credibility of the witnesses who signed the affidavit, these witnesses were examined under oath. The testimony of nearly all of them showed that their information as to the minds of the inhabitants was too limited to enable them to form an opinion. Two of the witnesses relied on by appellant as being a sufficient corroboration of the petition of appellant are Dr. J. C. Land and Homer Mays. Dr. Land had been over the district, but could not give the name of any person with whom he had talked, and when asked if he had not testified for appellant in every case he had had in the court, answered: "I might have. I don't know."

Homer Mays testified that he worked 175 or 200 men in different townships in the district, and would at different times stop at Roberts' Store or Allisons' Store, and the courthouse, and hear these men talk about this case. This witness said he had been in several townships, but according to his own evidence he never discussed the matter himself, and when asked what led him to believe the inhabitants were prejudiced, he answered: "Well, since this happened and during the time I was working a crew of men cutting off West Cache, about 175 or 200 men, and at different times I would stop at Mr. Roberts' store or Mr. Allisons', and on their way out there and at the courthouse here and on the street is all the talk I heard

about him." When asked if he thought it was impossible to get a jury that would give him justice, he answered that nothing is impossible.

This court has said: "Twelve citizens of the county subscribed to an affidavit supporting the motion. They were brought before the court and thoroughly examined as to the extent of their knowledge concerning the matter set forth in the motion. One of them was related by marriage to appellant; others wavered on the proposition of whether it was not possible for appellant to get a fair and impartial trial, and most of them confined their knowledge to the feeling of inhabitants residing in a particular locality in the county. The statute contemplates that the subscribing witnesses shall have fairly accurate information concerning the state of mind of the inhabitants of the entire county towards the defendant. *Speer* v. *State,* 130 Ark. 457, 198 S. W. 113; *Bryant* v. *State,* 95 Ark. 239, 129 S. W. 295; *Ford* v. *State,* 98 Ark. 139, 135 S. W. 821; *White* v. *State,* 83 Ark. 36, 102 S. W. 715; *Duckworth* v. *State,* 80 Ark. 360, 97 S. W. 280.

The above cases hold that the order of the court overruling the motion for change of venue is conclusive on appeal unless it appears that the court has abused its discretion. The trial court has large discretion in passing on a motion for a change of venue, and unless it clearly appears that he has abused his discretion, this court will not reverse.

Appellant calls attention to a number of authorities, but these authorities all show that the trial court has discretion and unless he abuses this discretion, this court will not reverse.

Of course the only question for the trial court, if the supporting witnesses are qualified electors of the county, is the question of their credibility, and when the trial court examines the witnesses under oath, sees them, and observes their manner on the witness stand, he is better able to judge of their qualifications and credibility than this court, and that is one reason why this court will not reverse unless it appears that there was a clear abuse of discretion.

It is next contended by appellant that the evidence was insufficient to convict the defendant because there is not sufficient corroboration of the testimony of the accomplice.

Section 3181 of Crawford & Moses' Digest provides: "A conviction cannot be had in any case of felony upon the testimony of an accomplice, unless corroborated by other evidence tending to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows that the offense was commit ted, and the circumstances thereof. Provided, in misdemeanor cases a conviction may be had upon the testimony of an accomplice."

The corroboration of the testimony of the accomplice, however, is not required to be direct, but it may be circumstantial; provided it is substantial and tends to connect the defendant with the commission of the offense.

In this case the stolen property was found at appellant's home, and witnesses testified that appellant stated in their presence that he thought the property was stolen when they brought it there. The accomplice who testified that he stole the property was working for appellant. One witness, the president of the corporation that owned some of the property that was stolen, testified that they found the property at Mullen's and recovered it, and he heard Mullen say that he told them when they brought the property that they ought not to be bringing it there, that he really thought it was stolen.

Deputy Sheriff Holder testified that he was at Mullen's with the other officers and saw the tools that belonged to the Ritter Company. Bert Frazier, another witness, testified that he was with the officers when they found the property at Mullen's. All these witnesses testified to statements that they heard Mullen make.

This court, in discussing the sufficiency of the corroboration of an accomplice, said: "Here the confession was not made by the defendant to an accomplice, but was voluntarily made to officers who arrested him. The defendant's own free confession was sufficient proof to show his own connection with the crime. It has been expressly

held that a confession of a defendant made to one who is not an accomplice, is sufficient to corroborate the testimony of an accomplice.'' *Knowles* v. *State,* 113 Ark. 257, 168 S. W. 148.

In the instant case the circumstances and evidence of the officers and the property being at Mullen's home are together sufficient to connect the appellant with the crime. See *Haskins* v. *State,* 148 Ark. 351, 230 S. W. 5; *Powell* v. *State,* 177 Ark. 938, 9 S. W. (2d) 583; *Brewer* v. *State,* 137 Ark. 243, 208 S. W. 290; *Middleton* v. *State,* 162 Ark. 530, 258 S. W. 995; *Celender* v. *State,* 86 Ark. 23, 109 S. W. 1024; *Vaughan* v. *State,* 58 Ark. 353, 24 S. W. 885; *Russell* v. *State,* 97 Ark. 92, 133 S. W. 188.

If there is any substantial evidence corroborating the evidence of an accomplice tending to connect defendant with the offense, whether the corroborating evidence is sufficient, is a question for the jury. There was substantial evidence to corroborate the accomplice.

We find no error, and the judgment is affirmed.