Pamela HAMMERS v. STATE of Arkansas

CR 78-5                                          565 S.W. 2d 406

Opinion delivered May 1, 1978
(In Banc)

[Rehearing denied June 5, 1978.]

*Hanks & Taylor,* Clayton, Mo., and *Wilson & Wilson,* by: *Ralph Wilson, Jr.,* for appellant.

*Bill Clinton,* Atty. Gen., by: *Jessee L. Kearney,* Asst. Atty. Gen., for appellee.

CONLEY BYRD, Justice. Following the remand of this case in *Hammers* v. *State,* 261 Ark. 585, 550 S.W. 2d 432 (1977), after a hearing the trial court ruled that appellant Pamela Hammers was not entitled to relief on equitable principles and reinstated her murder conviction. We reverse for the reasons hereinafter stated.

The record, based upon the testimony of appellant's counsel, the deputy prosecuting attorney and the prosecuting attorney shows that appellant had an agreement with the State for immunity from prosecution provided she would give testimony against her lover Eddie Stephens in accordance with a tape recorded statement she had given to the State on the evening of November 4, 1975. Appellant was in court ready to testify on both November 5th and 6th when the case against Eddie Stephens was continued because Thomas Griffin, a witness the State had failed to subpoena, was not present. On the morning of November 6th, in response to inquiry by appellant's non-resident counsel, the deputy prosecuting attorney stated that the promised immunity would hold even if Stephens should "cop out and plead guilty." The prosecuting attorney confirmed the deputy's agreement while admitting that he did not believe appellant's statement at the time.

The record shows that appellant had every right to rely upon the agreement consummated with the State and that she was not notified of anything to the contrary until after the State had obtained a guilty plea from Stephens and his agreement to testify against appellant.

During the testimony of the deputy prosecuting attorney, the trial court asked the following question:

"Q.  . . . At the time that you returned this statement and elected to prosecute Pamela Hammers, as far as you know, Pamela Hammers was still ready, willing and able to take the stand if called to testify to the facts set forth in her statement, whether it be true or false or whether the jury might believe it or not believe it?

A.  Yes, sir, I had no reason to believe that she was not going to appear. I had no tangible reason to believe she

would not testify. I had my own personal opinion but I felt like that we still had testimony coming from Pamela Hammers for whatever it was worth."

The prosecuting attorney testified that he believed appellant and her attorney had something to do with the disappearance of the witness Thomas Griffin in November of 1975 and that the State was conned by appellant.

The record shows that when Thomas Griffin first disappeared, the prosecuting attorney subpoenaed Eddie Stephens' mother to determine why Griffin absented himself, but she at that time took the Fifth Amendment. However, after Stephens pleaded guilty, his mother testified that appellant's attorney told her she had to get Griffin out of town. Appellant's counsel denied making any such statement to Stephens' mother and pointed out that he had refused to represent Stephens. Appellant's counsel also noted that it was not in the best interest of his client for the witness to be absent.

The deputy prosecuting attorney, who located Griffin to testify against appellant, admitted that Griffin stated that appellant's counsel had nothing to do with his disappearance. The record also shows that, as late as 11:00 p.m. before the witness' disappearance, the State was on notice that Griffin was scared and that he had been receiving some phone calls from Stephens' mother. Even then the State did not take the precaution of getting a subpoena served on Griffin.

On the record before us it is shown that the State, through its officials, made a bargain with the appellant for her testimony; that appellant stood ready and willing to testify at all times; and that the State took full advantage of the bargain until after Stephens entered his plea of guilty and promised to testify against appellant. Thus, we see that at all times appellant was entitled to rely upon the promise of the public prosecutor until after Eddie Stephens was convicted on a guilty plea and after he had the advantage of knowing what her testimony was going to be. It follows that the trial court erred in ruling that she was not entitled to immunity on equitable principles.

It has been suggested that the trial court should be affirmed because Eddie Stephens testified that: "She told me, setting in the back of the courtroom, I believe it was November 6th, I was to go to trial, . . . 'I am not going to testify.' She was to be granted immunity and I would be acquitted." If a negotiated grant of immunity can be set aside upon such uncorroborated testimony by a codefendant, after the codefendant has successfully negotiated a reduced sentence, then counsel will never be able to safely advise his client to give testimony in exchange for a grant of immunity. We note that the State, in making its decision to prosecute appellant as set out above, readily acknowledges that she stood ready to testify at all times.

As pointed out in *People v. Brunner*, 32 Cal. App. 3d 908, 108 Cal. Rptr. 501 (1973), it is a fact of life that the quality of veracity and honor among thieves and murderers leaves something to be desired, and the prosecuting attorney, upon whose shoulders the problem first falls, may find that in granting immunity to one he could have prosecuted he has exchanged gold for brass. Yet, on the other hand, it is sometimes the heavy persuasion of family and friends that finally convinces one charged with a crime that he or she should exchange testimony for a grant of immunity. In the last analysis, such matters must be considered from the standpoint of some standard applicable to the State as a whole for it is sometimes necessary to have the testimony of a codefendant to solve even the most heinous crime.

Reversed and dismissed.

HARRIS, C.J., and HICKMAN, J., concur.

FOGLEMAN, J., dissents.

CARLETON HARRIS, Chief Justice, concurring. I concur with the majority in this reversal because I simply feel that the State should have lived up to its agreement. As I understand the agreement entered into between the deputy prosecutor and counsel for Pamela Hammers around November 3 or 4, 1975, said agreement was that if Pamela Hammers testified at the trial of James Eddie Stephens, the other defendant, to be held on November 5, to the same facts

previously related to the prosecutor, she would be granted immunity from prosecution. To me, the sole question is whether there was such an agreement, and in my view it clearly appears that the answer would be in the affirmative.

Under questioning by the court, the Deputy Prosecuting Attorney testified that counsel for Hammers (Mr. Hanks) asked him if they had a "deal" and he answered "Yes;" that Hanks further asked, "Do we have a deal if Eddie pleads guilty?" and he (deputy prosecutor) replied, "Yes."

Stephens was not tried on November 5 because of the absence of a witness, but I am unable to see how this affects the agreement herein referred to. There is no evidence that Ms. Hammers was responsible for the absence of the witness, or had anything whatsoever to do with his failure to show up for the trial. In fact, he was not even subpoenaed by the state (which I cannot at all understand). The deputy testified that he was a little dubious that appellant was being entirely truthful — but nonetheless, the agreement was consummated. It is my feeling that if there was doubt that Ms. Hammers was telling the truth — then the agreement should not have been entered into until the true facts were ascertained. And I might add that I am unable to see why a lie detector test taken by Stephens indicating that appellant had not been entirely truthful is pertinent to the issue before us.[1]

Of course, except for the fact that Stephens pleaded guilty (apparently after learning that Ms. Hammers was due to testify against him), there is every indication that he would have been tried and Hammers would have testified; at least, there is no showing to the contrary.

To permit the defendant to be tried when she apparently stood willing to do all that she had agreed to do, simply because the other defendant had decided to plead guilty, making her testimony unnecessary, is, to me, not only unwarranted, but could seriously damage negotiations between prosecutors and defense attorneys in the future.

---

[1] It is, to say the least, unusual to assert or imply that one defendant (untested) has lied, based on utilizing the lie detector test on another defendant (who pleaded guilty to second degree murder).

I am authorized to state that Justice Hickman joins in this concurrence.

JOHN A. FOGLEMAN, Justice, dissenting. I was somewhat amazed when counsel for appellant suggested de novo review in oral argument before this court, even though he knew of no authority for such an approach in a criminal case. Amazement turned to shock when the court accorded appellant that type of review, also without authority for that sort of action. Passing upon the credibility of the witnesses, as the majority has done, is also without precedent.

In viewing the matter it is necessary that we first consider the holding on the first appeal. It is capsuled in the following excerpt from the opinion in *Hammers v. State,* 261 Ark. 585, 550 S.W. 2d 432:

> But the determination of a claimant's equitable entitlement to immunity, when opposed by the prosecuting attorney, should lie within the *sound judicial discretion of the trial court,* which should see that the public faith pledged by the public prosecutor, in the furtherance of justice, is kept by giving due regard to promises and inducements made and held out by him, *when the claimant has fulfilled his agreement in good faith.* ***** It is appropriate to consider the extent of the claimant's performance of the bargain. ***** In doing so, it should be remembered that the primary purpose of the exchange is to facilitate the prosecution of crime, not to grant immunity. *****

> Although the state is not estopped by the unauthorized act of its agent, ***** appellant *should be equitably entitled to have her agreement with the prosecutor enforced if she complied with its terms in good faith and made a full, fair, free and candid disclosure of all facts pertaining to the crimes charged, even though that requires barring her prosecution for the crimes.* There does not seem to be any doubt about her being ready, willing and able, but not called upon, to testify. *The burden of proving the agreement and appellant's compliance with it rested upon her.* ***** [Emphasis mine.]

It must then be remembered that appellant had the bur-

den of proving that she complied *in good faith* with her agreement with the prosecuting attorney and made *a full, fair, free and candid disclosure of all facts* pertaining to the crimes charged. The trial court, after hearing the evidence, rendered this opinion:

> From the totality of the facts and circumstances developed during this hearing concerning the agreement negotiated by the defense and the prosecuting attorney's office, it is the judgment and finding of the court that the defendant, Pamela Hammers, is not entitled on equitable principles as laid out in the Supreme Court opinion on May 16, 1977, styled *Pamela Hammers* v. *State of Arkansas*. Therefore, it is the order and judgment of the court that the judgment of conviction and sentence to a term of eight years will be and is hereby reinstated.

This has been an unusual case from the beginning. It is now decidedly unique. In order to reach a result it apparently considers desirable as a matter of public policy in prosecutorial deals with accomplices, the majority has given de novo review to the trial court's action on disputed evidence, made credibility determinations and completely ignored the law of the case. The court should be at least as concerned about the stability of appellate judicial decisions and for the consistent observance of the limited scope of appellate review, as it is about the ability of a lawyer to advise his client to give testimony for a grant of immunity.

In this case, there was an exercise of the trial court's judicial discretion. The court's finding was, in effect, a holding that appellant had failed to meet her burden of proof. Of course, we should not reverse the trial court's action unless there was a manifest abuse of the court's discretion. This does not involve, require, or permit de novo review. The only situation in which our review of the action of a circuit court in a criminal case even approaches de novo review is the very isolated instance of review of the trial judge's determination of the voluntariness of a confession, imported into our law in *Harris* v. *State,* 244 Ark. 314, 425 S.W. 2d 293, cert. den. 393 U.S. 941, 89 S. Ct. 308, 21 L. Ed. 2d 278. In retrospect, it is clear to me that we were not required to take this step, as we thought when *Harris* was decided. See *Vault* v. *State,* 256 Ark.

343, 345, 507 S.W. 2d 111, 113 (Fogleman, J., concurring). Not only was it not necessary that we broaden the scope of review in that particular question, its implementation proved quite troublesome. (See *Vault v. State,* Fogleman, J., concurring, supra.) After floundering in this unprecedented sea of uncertainty, we finally settled on a standard of review in *Degler* v. *State,* 257 Ark. 388, 517 S.W. 2d 515. Still, even in *Harris* we said:

> ***** That does not mean that the findings of the trial judge must be shunned. They are entitled to considerable weight in resolving evidentiary conflicts and to respectful consideration on the crucial issue of voluntariness.

In *Johnson* v. *State,* 249 Ark. 268, 459 S.W. 2d 56, we gave "appropriate, but not controlling weight to the findings of the trial judge." In *Watson* v. *State,* 255 Ark. 631, 501 S.W. 2d 609, in spite of a reversal, we resolved conflicts in the evidence in favor of the trial judge's holding.

We also said in *Watson* that we must view the testimony in the light most favorable to the court's holding. So even if we should follow the *Harris* rule in this case, we must view the evidence in the light most favorable to the state and resolve conflicts in the evidence in favor of that ruling.

Before proceeding, however, to a view of the evidence, I should point out that even the *Harris* scope of review is not appropriate here under our previous decisions. I would first review our holdings with reference to a trial court's fact-finding, as I did in concurring in *Vault,* viz:

> We long held that the findings of fact by a circuit judge on any question properly submitted to him would not be set aside on appeal if supported by substantial evidence. *Bank of Atkins* v. *Wirth,* 209 Ark. 360, 190 S.W. 2d 445; *Ward* v. *Nu-Wa Laundry Cleaners,* 205 Ark. 713, 170 S.W. 2d 381; *Matthews* v. *Clay County,* 125 Ark. 136, 188 S.W. 564; *Cady* v. *Pack,* 135 Ark. 445, 205 S.W. 819; *French* v. *State,* 187 Ark. 782, 62 S.W. 2d 976; *Beason* v. *State,* 166 Ark. 142, 265 S.W. 956; *Decker* v. *State,* 85 Ark. 64, 107 S.W. 182. We once said that when circuit courts

are required by law to pass upon questions of fact, the findings are as conclusive on appeal as the verdicts of juries. *Cady* v. *Pack,* supra; *French* v. *State,* supra. The substantial evidence rule has been applied in other cases in which deciding a factual question has been essential to a determination whether the proper foundation has been laid for admitting evidence. See *Ruloff* v. *State,* 142 Ark. 477, 219 S.W. 781. *****

Where action lies within the judicial discretion of the trial court, there is little if any difference in our treatment of the court's fact-finding. Of course, all presumptions are indulged in favor of a trial court's ruling. *Williams* v. *State,* 258 Ark. 207, 523 S.W. 2d 377. Thus, we must indulge every presumption in favor of the proper exercise of the trial court's discretion. See *McClain* v. *State,* 165 Ark. 48, 262 S.W. 987. Furthermore, in any feature of a case presenting an issue of fact, upon which the testimony is in conflict, the trial court is the safe judge of the weight of the evidence and the credibility of the witnesses and its finding is conclusive, even though we may regard its finding to be clearly against the decided weight of the evidence. *Fairbanks* v. *State,* 155 Ark. 48, 243 S.W. 950; *Frame* v. *State,* 73 Ark. 501, 84 S.W. 711; *Decker* v. *State,* 85 Ark. 64, 107 S.W. 182; *Harris* v. *State,* 177 Ark. 186, 6 S.W. 2d 34. See also, *Groning* v. *State,* 155 Ark. 85, 243 S.W. 959. The trial judge's finding on any question of fact submitted to him is as conclusive in this court as the finding of a jury. *Hooper* v. *State,* 186 Ark. 1197, 57 S.W. 2d 810; *Fogg* v. *State,* 81 Ark. 417, 99 S.W. 537.

In matters involving the exercise of the trial court's discretion, we defer to the trial judge's evaluation of credibility in reviewing the evidence, because the judge "who hears the testimony and observes the demeanor of the witnesses, while on the stand is in a much better position to judge the credit that should be given their statements, than this Court could possibly be." *Parnell* v. *State,* 206 Ark. 652, 176 S.W. 2d 902; *Mullen* v. *State,* 193 Ark. 648, 102 S.W. 2d 82. See also, *Fikes* v. *State,* 221 Ark. 81, 251 S.W. 2d 1014. Where there are conflicts in the testimony on the issue this court should not hold that there is an abuse of discretion, for the finding of the trial court is conclusive. *Pendergrass* v. *State,* 157 Ark. 364, 248 S.W. 914. See *Robertson* v. *State,* 212 Ark. 301, 206 S.W. 2d 748.

Where the evidence is in conflict, it is not our province to determine the issues of fact raised. *Sheppard* v. *State,* 239 Ark. 785, 394 S.W. 2d 624, cert. den. 387 U.S. 923, 87 S. Ct. 2038, 18 L. Ed. 2d 977. See also, *Elser* v. *State,* 243 Ark. 34, 418 S.W. 2d 389.

Viewed in the light most favorable to the court's holding, the record discloses:

Appellant's leading counsel, a Missouri attorney, was employed sometime in August, 1975. He questioned his client about what had happened. He ascertained that there were no witnesses he could present in her behalf. Eddie Stephens called this attorney in September, 1975, seeking to employ him. The offer was declined by the attorney, who felt that the interests of Pamela Hammers and Stephens could conflict. He told Stephens that he could refer him to another attorney and expressed the opinion that it would cost Stephens $15,000 to employ another attorney. The attorney told Stephens to keep his mouth shut. At this time this attorney knew nothing about Griffin, a key witness for the state, except that his name was endorsed on the information in the case as a witness, that Griffin was from California, and that the state intended to have this witness at the trial. He had the benefit of a police report in respect to Griffin. Pamela Hammers was released from jail in the latter part of September, 1975. She had made some statements to the sheriff about her role in the murder, which were not completely truthful, due to the fact that she did not have a lawyer at the time (according to her). On or about October 27, 1975, either Mae Holcott (Stephens' mother) or her daughter called this attorney about representing Stephens. Mrs. Holcott also asked about a lawyer for $15,000, but appellant's attorney told her that he would refer them to an attorney and estimated his fee at $15,000.

At some time after the Missouri attorney was employed, he became interested in obtaining a grant of immunity for his client in exchange for her testimony against her co-defendant Stephens. Appellant's attorney had never before entered into a transaction for one co-

defendant testifying against another when they were jointly charged. He was of the opinion that the state's case was very weak, if neither of these co-defendants testified against the other. He entered into negotiations because he felt that a trial for murder in the first degree was too great a chance to take with the life of a young girl. He filed a motion for severance just before he came to Blytheville for the trial. It was granted on the day that Miss Hammers made her statement. Negotiations between appellant's attorney and the prosecuting attorney's office started after the motion for severance was granted. The attorney came to Blytheville in November, 1975, two days before the trial was to begin. It took quite a bit of negotiations before an agreement was reached. On that evening the Missouri attorney, the deputy prosecuting attorney, the sheriff, Pamela Hammers and her stepfather met at the Ramada Inn where the attorney was staying and discussed the matter. The prosecuting officers did not know what her statement would be, but appellant's attorney assured them it would be sufficient to convict Eddie Stephens of first degree murder. An agreement was reached to the effect that appellant's statement would be taken, and, if it proved sufficient, and, if she then agreed to testify, the prosecuting attorney would file a memorandum with the court requesting the court to grant her immunity. After the statement was taken, appellant's attorney was advised that, at the close of her testimony, the prosecuting attorney would file a memorandum with the court, requesting that she be granted total immunity. The deputy prosecuting attorney told appellant's attorney at this time that he was not convinced that she would ever get on the witness stand and testify according to the statement. Up until this occasion, appellant had not made any admission, confession or factual narrative concerning the crime. The deputy prosecuting attorney knew that appellant had made prior inconsistent statements to the Mississippi County sheriff and to persons in California. The case was scheduled to go to trial on the day following the giving of the statement.

Mae Holcott called the Missouri attorney at his motel room after the Hammers statement had been

given, but on the same night. Appellant's attorney had talked to Thomas Griffin at the Holiday Inn in Blytheville. The attorney said to her, "I thought you said Thomas wasn't going to be here, but he is here. He has been since last Friday . . . out at the Holiday Inn under an assumed name . . . Thomas is going to testify. You have to get him out of town tonight." The attorney told her that, in his opinion, Stephens would be found "guilty of murder if Griffin testified against him." She called Griffin, but learned that the deputy prosecuting attorney was in his room. She told Griffin that it was up to him, that he would have to decide for himself what to do because she couldn't advise him. She called Griffin back later, but the deputy prosecuting attorney was still in his room. Still later, Griffin came to her house and was extremely nervous, and said that appellant's attorney had really upset him. Mrs. Holcott called appellant's attorney again, with Griffin on the extension. The attorney again told her to get Griffin out of town that night, because the prosecuting attorney and deputy prosecuting attorney were fools and had not subpoenaed Griffin during the four days he had been in town. He told her to tell Griffin to leave the plane ticket and car keys, and to pay his room rent for the time he was there. He also stated that, under Arkansas law, a witness who was a thousand miles away could not be brought back by the state. On the following day appellant's attorney called Mrs. Holcott at her place of employment and told her he thought Griffin had left town. The attorney knew that the trial had not started, but did not know that Griffin had left. He did tell her that he was going back to St. Louis and that he did not want to talk to her or Eddie anymore and didn't want to see her in the courtroom.

After appellant's attorney had talked with Griffin, the deputy prosecuting attorney talked with him on the night before the case was set for trial. Griffin was extremely nervous. He was afraid that the evidence would disclose that he was and had been a homosexual. Although Griffin said that neither appellant nor her attorney had told him to leave town, he said that this attorney had "scared the hell out of me about what he is

going to do up there in court," and that somebody had tried to encourage or advised him to leave and not be available to testify. During this conference, Griffin had two telephone conversations. One of them seemed to upset him tremendously. When he told the deputy prosecuting attorney that the conversation was with Mrs. Holcott, the deputy prosecuting attorney asked if someone was trying to tamper with his testimony. Griffin replied that he did not know, that he did not understand it, that he was frightened and didn't know what to do.

The day the case was set for trial, the sheriff told the deputy prosecuting attorney that Griffin was gone and had left the plane ticket and the keys to the car provided him by the state. The state then asked for a continuance for a day, but when Griffin could not be found, moved for and was granted a continuance for the term.

On the day the case was originally set for trial, appellant's attorney talked with Eddie Stephens in the jury room. He had already talked with Griffin and knew that Griffin was going to testify. He expressed to Stephens his opinion that if Griffin did testify as he had indicated to this attorney and to Stephens' attorney, Stephens would probably be convicted of first degree murder and advised him to make a deal with the prosecuting attorney for something less. Stephens told this attorney that he did not think Griffin would testify and asked appellant's attorney to call Mrs. Holcott, as he did. Stephens asked appellant's attorney to find out where Griffin was and ascertain whether there wasn't some way Griffin would leave. The attorney told Stephens that Griffin was at the Holiday Inn. Appellant's attorney did not tell Stephens that Miss Hammers was going to testify against him.

Pamela Hammers talked with Stephens in the court room on the day the case was continued for the term. Stephens had learned on the original date the trial was to commence that Griffin had left town. Miss Hammers told Stephens she wasn't going to testify. She said that

she was to be granted immunity and that he would be acquitted.

Thereafter, the attorney for Stephens, who had been insisting that Stephens' version of the killing was true, finally prevailed upon the deputy prosecuting attorney to submit Stephens to a polygraph examination in Little Rock. On March 6, 1976, the deputy prosecuting attorney asked the Sheriff to take Stephens to Little Rock for that purpose. The test was conducted by a polygraph examiner for the Arkansas State Police. He determined that Stephens had told him the truth and showed deception only on negative answers to questions about his strangling the victim and about his intention to lie to the examiner on the test.

After the polygraph test, the deputy prosecuting attorney reviewed the results and concluded that Miss Hammers had not been completely truthful in her statement and that her role in the crime had been much greater than she had indicated. He took a statement from Stephens on March 11, 1976, in which Stephens implied that he had had a strong interest in trying to get Griffin out of the state and that there had been some tampering with Griffin. He implicated appellant's attorney by indicating that Mrs. Holcott had information about conversations with this attorney. The deputy prosecuting attorney then subpoenaed Mrs. Holcott. In spite of the fact that she had pleaded her Fifth Amendment rights on every question addressed to her by the prosecuting attorney when subpoenaed shortly after Griffin's disappearance, she made a complete statement about her role and the role of Stephens and others in this respect.

The deputy prosecuting attorney concluded that "we were being conned" and couldn't see "ganging up on Eddie Stephens and allowing Miss Hammers to walk free" and that Miss Hammers was trying to "help Eddie out the back door."

The testimony of Griffin was corroborative and neither of the co-defendants could have been convicted

without the testimony of the other or without the testimony of Griffin. The prosecuting attorney and his deputy concluded that Miss Hammers had not been truthful in her statement and that she had not acted in good faith. In March, 1976, they returned the statement to appellant's attorney, destroyed the tape and advised appellant's attorney that the case against her was being set for trial. The statement was not used at her trial. On Tuesday, March 4, 1976, appellant, in a telephone conversation, had said that she wanted Mrs. Holcott to keep Griffin out of town.

Although appellant's attorney testified that his conversation with Griffin was carried on in the presence of Stephens' attorney, a Blytheville lawyer, this lawyer was not called as a witness. Appellant's attorney, who had talked with Mrs. Holcott, did not cross-examine him, but left that to his local co-counsel, who had not participated in any of the negotiations or any of the conversations with the interested parties. It is true that the appellant's attorney denied ever telling Griffin to keep his mouth shut, denied the content of his conversation with Mrs. Holcott as stated by her (although he admitted having had conversations with her at approximately the times indicated by Mrs. Holcott) and denied any knowledge of any conversation between appellant and Mrs. Holcott. It is also true that appellant denied that she had made the statements attributed to her by Mrs. Holcott and by Stephens. She admitted having conversed with Stephens in the courtroom, but says that she told him she was going to testify against him. Even so, the question of credibility of the witnesses was a matter for the trial court's determination, and the majority has given no valid reason for rejecting the testimony of Stephens and Mrs. Holcott on appellate review.

On this record, the trial judge had a basis for finding that the negotiation for immunity and the disappearance of Griffin were part and parcel of the same transaction and that appellant did not enter into the negotiations or the agreement in good faith. He also had a basis for finding that Pamela Hammers did not make a full, free, frank and candid disclosure of the true facts in the case. It is quite true that the trial court might have, in the exercise of sound judicial discre-

tion, reached the result reached by the majority. But that does not mean the trial judge erred. The exercise of this discretion was for the trial court, not this court. The majority has carefully avoided saying that the trial court abused its discretion. How could it? Was it an abuse of discretion to believe Stephens and his mother and not an attorney?

We admonished the trial court to remember that the primary purpose of such a bargain is to facilitate the prosecution of crime and not to grant immunity. The majority has not heeded that admonition.

Of course, I would affirm the judgment.